NOTICE

Decision filed 05/27/20. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2020 IL App (5th) 200014-U

NO. 5-20-0014

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| *In re* J.M.J., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Jefferson County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 15-JA-56 |
| v. | ) | |
| | ) | |
| Ashley L., | ) | Honorable |
| | ) | Evan L. Owens, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE WELCH delivered the judgment of the court.
Justices Cates and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's order terminating the respondent mother's parental rights to her minor child is affirmed where the court's finding that termination of her parental rights was in the best interests of the minor child was not against the manifest weight of the evidence, where the respondent mother's argument that her due process rights were violated by the guardian *ad litem*'s (GAL) failure to follow statutorily required GAL duties was forfeited by her failure to raise the issue in the trial court, and where her counsel was not ineffective.

¶ 2    The respondent mother, Ashley L., appeals the judgment of the circuit court of Jefferson County terminating her parental rights to her minor child, J.M.J.  On appeal, Ashley L. argues that the court's finding that termination of her parental rights was in the

1

best interests of J.M.J. is against the manifest weight of the evidence, that her due process rights were violated by the guardian *ad litem*'s (GAL) failure to follow statutorily required GAL duties, and her counsel was ineffective. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      J.M.J. was born in March 2012 to Ashley L. and Cody J. Although Cody J.'s parental rights were also terminated, this appeal only involves the termination of Ashley L.'s parental rights. Thus, we will only discuss those facts pertinent to the termination proceedings involving Ashley L.

¶ 5      On August 12, 2015, the State filed a petition for adjudication of wardship, asserting that J.M.J. was a neglected minor and requesting that she be adjudicated a ward of the court. The petition alleged that J.M.J. was neglected in that her environment was injurious to her welfare in violation of section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2014)) where Ashley L. had substance abuse issues; had tested positive for amphetamines, benzodiazepines, marijuana, opiates, and methamphetamine; and she had expressed suicidal ideations.

¶ 6      On August 13, 2015, the trial court entered an agreed temporary custody order, finding that there was an immediate and urgent necessity to remove J.M.J. from her parents' care and that leaving J.M.J. in the home was against her health, welfare, and safety. The court placed temporary custody of J.M.J. with the Illinois Department of Children and Family Services (DCFS). On September 24, 2015, a DCFS integrated assessment was prepared, which reported the following: that Ashley L. and Cody J. had abused heroin, marijuana, and prescription drugs on a regular basis and in J.M.J.'s presence; that Cody J.

2

had committed a theft at Wal-Mart and that J.M.J. was reportedly in the vehicle when this occurred; that Ashley L. and Cody J. had driven with J.M.J. in the car while under the influence; that Ashley L. acted "manic" when under the influence; and that there was an allegation that J.M.J.'s maternal grandfather had sexually molested her.

¶ 7   According to the assessment, Ashley L. reported the following: she was unemployed; she was currently living in her friend's home; prior to living with her friend, she was homeless; although she suspected that J.M.J. was being sexually abused by her father, she continued to leave J.M.J. in his care; her relationship with her mother was strained; she was diagnosed with major depressive disorder and posttraumatic stress disorder but was not taking any medication for those disorders; she used prescription pain medication on a daily basis until she started using heroin; she had not used heroin for approximately one month; and although she admitted struggling with substance abuse issues, she denied needing inpatient treatment.  The assessment also indicated that she minimized the impact her drug use had on J.M.J. and denied using drugs in front of J.M.J. but acknowledged parenting J.M.J. while under the influence.

¶ 8   The assessment further indicated that Ashley L. required services to address her mental health, substance abuse issues, lack of resources, and parenting practices; that she would need to demonstrate stability in her living situation; and that she would need to show longevity with remaining sober and the ability to appropriately support J.M.J.'s health, educational, and developmental needs.  The assessment identified the following services that were essential for a safe reunification: substance abuse treatment; psychiatrist assessment; individual trauma informed psychotherapy to create and implement healthy

3

coping skills and to focus on positive parenting practices; an in-home parenting support program; assistance in providing and maintaining appropriate living conditions; assistance with finding and maintaining employment; and supervised visitation with J.M.J. The assessment indicated that J.M.J. was placed in traditional foster care on August 21, 2015.

¶ 9 On September 23, 2015, DCFS prepared a family service plan, requiring Ashley L. to complete the following tasks: (1) cooperate to correct the issues that caused J.M.J. to come into care; (2) participate in weekly visits with J.M.J.; (3) successfully complete parenting classes to increase her understanding of child development, appropriate discipline/supervision of J.M.J., and to develop a consistent plan for parenting to learn appropriate parenting skills; (4) fully participate in counseling assessment/evaluation; (5) complete urine or blood tests as requested; (6) stop the use of all alcohol and nonprescribed medication; (7) complete an alcohol/drug assessment; and (8) cooperate with recommendations made as a result of counseling and alcohol/drug assessments. The recommended permanency goal was to return J.M.J. home within 12 months.

¶ 10 On October 5, 2015, Lutheran Child and Family Services of Illinois (Lutheran) filed a status report, which reported that, since the completion of the integrated assessment, the caseworker had been unable to locate Ashley L.; J.M.J. was adjusting well in her foster home; she had developed a strong bond to her foster mother; she experienced separation anxiety when her foster mother had to leave her at daycare; and she was hesitant around her foster father and men in general. On November 9, 2015, Lutheran filed a second status report for the adjudicatory hearing, which indicated that, although the caseworker had

4

spoken with Ashley L., the caseworker was not aware of Ashley L. making any appointments for the requisite services.

¶ 11   On November 23, 2015, the trial court entered an agreed adjudicatory order, finding that J.M.J. was an abused or neglected minor in that she was in an environment that was injurious to her welfare because Ashley L. and Cody J. had substance abuse issues.

¶ 12   On January 4, 2016, Lutheran filed another status report, which indicated that Ashley L. had been in the Jefferson County jail for a probation violation and was released on December 30, 2015; that she scheduled an open intake for substance abuse treatment on January 4, 2016; and that she had not had any visits with J.M.J.  A Lutheran status report filed on March 2, 2016, noted that Ashley L. was initially not compliant with services, but she had improved her contact with her caseworker; that she was currently attending substance abuse services and was attending parenting classes; that she was currently on probation; and that she was currently staying with a friend and was still unemployed.

¶ 13   On April 6, 2016, a case report was filed and indicated that Ashley L. had been arrested for violating probation and felony drug violation (possession of methamphetamine and alprazolam), and she was currently in the Jefferson County jail.  The report indicated that the caseworker had questioned Ashley L. about providing suitable housing for J.M.J., and she replied that she had a trailer located on her parents' property.  When the caseworker brought up the sexual abuse allegations against her father, she responded, " 'if he did it, he will be put in prison, if he is not put in prison, he didn't do it.' "  The Lutheran status report filed on April 6, 2016, indicated that Ashley L. could not continue substance abuse counseling and parenting classes while in jail, and the caseworker was unsure about

5

continuing her weekly visitation with J.M.J. while she was in jail. The Lutheran status report filed June 20, 2016, noted that Ashley L. was incarcerated at the Logan Correctional Center and that she could participate in parenting and mental health counseling there.

¶ 14 A DCFS family plan filed on September 9, 2016, reported that Ashley L. was moved to Decatur Correctional Center and that her projected parole date was September 28, 2016, and her projected discharge date was September 28, 2017. She would have to restart all of her services once released. She was rated unsatisfactory on maintaining consistent visitation, completing counseling, completing parenting classes, completing substance abuse treatment, and maintaining suitable housing due to being incarcerated.

¶ 15 On September 12, 2016, a case report was filed, which indicated that Ashley L. was still incarcerated and that J.M.J. had a visit there, but J.M.J. had behavioral issues after the visit. The report stated that J.M.J. had been exhibiting extreme anxiety, frequently lashed out, and was fearful that her foster parents would leave her at daycare.

¶ 16 The report indicated that she also exhibited concerning behavior after seeing her maternal grandfather in court for the first time since placed in state custody.

¶ 17 That same day, the trial court entered a dispositional order, finding that Ashley L. was unable to care for, protect, train, educate, supervise, or discipline J.M.J. because she was incarcerated and leaving custody and guardianship of J.M.J. with DCFS. The permanency goal remained to return J.M.J. home within 12 months.

¶ 18 On October 17, 2016, Lutheran filed a status report, which indicated that Ashley L. was recently released from incarceration, she was living with her aunt, and she was in the process of getting Medicaid and her driver's license back. The report also indicated that

6

she was aware that she had to complete substance abuse and parenting assessments and that she was staying in contact with her caseworker. That same day, the trial court entered a permanency order, finding that Ashley L. had not made reasonable and substantial progress toward J.M.J. returning home. The permanency goal remained to return J.M.J. home within 12 months. On December 30, 2016, another status report was filed, which indicated that Ashley L. was receiving weekend visitation with J.M.J., and she had obtained full-time employment. The January 6, 2017, Lutheran permanency hearing report indicated that Ashley L. had made an appointment for her substance abuse assessment and was doing one-on-one parenting classes with her caseworker.

¶ 19 On February 28, 2017, DCFS filed a permanency hearing report, which rated Ashley L. as follows: (1) satisfactory for visitation in that she had weekly visitation with J.M.J.; (2) unsatisfactory for her mental health assessment because it had not been completed; (3) unsatisfactory for housing because she currently lived with a relative; (4) unsatisfactory for parenting because she missed three consecutive parenting classes and was removed from the class; and (5) unsatisfactory for substance abuse assessment because she failed to show up for her appointment to complete the second part of the assessment. That same day, a family service plan was filed, which reported that Ashley L. had consistently visited with J.M.J. on a weekly basis and had not cancelled any visits; that once she completed her substance abuse assessment, she would have to complete a new mental health evaluation; that she was looking for suitable housing for her and J.M.J.; and that she had been removed from parenting classes and would need to register for the next set of classes. On March 3, 2017, a case report was filed that indicated Ashley L. had continued to maintain steady

7

employment; she had expressed interest in taking college classes; and although her weekend visitation had been reduced because weekend visits had not been formally approved, she was receiving unsupervised one day per week visits with J.M.J.

¶ 20    On March 6, 2017, the trial court entered another permanency order, finding that Ashley L. had made reasonable efforts toward returning J.M.J. home.  The permanency goal remained to return J.M.J. home within 12 months.  On April 13, 2017, Lutheran filed a status report, which indicated that Ashley L. was not currently engaged in services, she had not been attending visitations because she did not have transportation, and the caseworker was trying to get her supervised visits in her community so that she could walk there.

¶ 21    On August 7, 2017, a permanency hearing report was filed, which rated Ashley L. as follows: (1) satisfactory for visitation; (2) unsatisfactory for mental health as she had not completed her assessment; (3) unsatisfactory for obtaining suitable housing as she currently lived with a friend; (4) satisfactory for parenting as she had completed parenting classes; and (5) satisfactory for substance abuse as she had completed her assessment and was currently attending group and individual weekly meetings.  The report indicated that her visitation with J.M.J. was currently supervised, but it would become unsupervised once all members of the household passed a background check.

¶ 22    On August 21, 2017, the trial court entered a permanency order, finding that Ashley L. had made reasonable efforts toward returning J.M.J. home.  The permanency goal remained to return J.M.J. home within 12 months.

¶ 23   On September 6, 2017, DCFS filed a family service plan, which indicated that Ashley L. was engaged in substance abuse counseling, but she still needed to complete her mental health assessment.

¶ 24   On November 8, 2017, DCFS filed a permanency hearing report, which rated Ashley L. as follows: (1) satisfactory for visitation; (2) unsatisfactory for her mental health as she had not completed her assessment; (3) unsatisfactory for obtaining suitable housing as she was still living with her friend; (4) satisfactory for parenting; and (5) unsatisfactory for substance abuse as she had only sporadically attended group and individual meetings. It had been reported that Ashley L. was no longer employed because she had overdosed at work and that, while en route to the hospital, she had flatlined and needed to be revived. Her caseworker requested that she sign a consent for release of medical information to verify the overdose reports.  However, Ashley L. refused to sign the consent.  Because there was no proof that she was not using heroin during her unsupervised visits, her visits were changed to supervised.  Thereafter, Ashley L. admitted that she had overdosed on heroin, but she still refused to sign a medical release and refused her random drug test on October 29, 2017.  The report also indicated that her visitation had temporarily ceased because, on multiple occasions, J.M.J. came home with lice.  The visits were set to resume once everyone in the household obtained medical certification that they were lice free; the visits would then be one hour supervised visits one time per week.  On December 14, 2017, a status report was filed, which indicated that Ashley L. had tested positive for methamphetamine on December 1, 2017.

¶ 25    On January 22, 2018, a status report was filed, which indicated that Ashley L. had missed two out of three of her visitations with J.M.J., that she was still living with her friend and was unemployed, that she had tested positive for methamphetamine on two occasions, and that she had quit her substance abuse counseling because she was tired of asking for rides to the appointments. The caseworker reported that she had attempted to drug test Ashley L. on January 11, but Ashley L. did not want to test and admitted that she would not pass. Although Ashley L. had successfully competed parenting classes, her counselor expressed concern that she was too soft on J.M.J. and would not be a strong disciplinarian if J.M.J. was returned home.

¶ 26    On January 26, 2018, Lutheran filed a status report, which rated Ashley L. as follows on her service plan: (1) satisfactory for visitation; (2) satisfactory for completing her mental health assessment, but she had not started mental health services; (3) unsatisfactory for obtaining suitable housing as she was still living with her friend, and although she had expressed a willingness to move into her own apartment, she had not been home the times her caseworker dropped by to give her an apartment application; (4) satisfactory for parenting; and (5) unsatisfactory for substance abuse because she was unsuccessfully discharged in December 2017 due to lack of attendance. The report also indicated that Ashley L. had expressed that she no longer needed substance abuse classes because she was "done" and that she could not find employment because she lacked transportation. The report further indicated that Ashley L.'s caseworker had monthly in-person contact with her; that she had eventually signed the medical release consent, and it was verified that she had overdosed from heroin in a bathroom of a public establishment; that she admitted that

she would not pass a drug test on January 11; that she did not want to take a drug test on January 24 and was concerned that she was going to get kicked out of her friend's home; and that the caseworker went to her home on January 25, 2018, to complete a drug test, but no one answered the door.

¶ 27   On January 29, 2018, the trial court entered a permanency order, finding that Ashley L. had not made reasonable and substantial progress toward returning J.M.J. home because she was still having "issues with illegal narcotics."  The permanency goal remained to return J.M.J. home within 12 months.

¶ 28   On March 15, 2018, a case report was filed, which indicated that, during two visitations, Ashley L. stayed in bed for the duration of the visits and that, although J.M.J.'s birthday was March 3, Ashley L. did not give her a card or a gift.  The report also indicated that Ashley L. was still living with her friend, was still unemployed, was not attending counseling, and was consistently refusing drug testing.

¶ 29   On March 16, 2018, Lutheran filed a status report, which rated Ashley L. as follows regarding services: (1) unsatisfactory for visitation because she had not attended all of her visits, and she often had to be reminded to provide dinner during visits; (2) unsatisfactory for mental health in that she had not engaged in recommended group and individual counseling; (3) unsatisfactory for obtaining suitable housing because she was still living with her friend, who had threatened to kick her out of the house due to her drug use; (4) satisfactory for parenting; and (5) unsatisfactory for substance abuse in that she had an appointment to meet with her substance abuse counselor to restart services and failed to show.  The report indicated that Ashley L. had contacted her caseworker and stated that

she was going to move to Rockford, Illinois, to live with a friend because she was being kicked out of her current home. When the caseworker told her that it was not in her best interest to leave town, she responded that she had reached out to everyone she knew, including her mother, for housing, and this was her only option. When the caseworker contacted her thereafter, she told the caseworker that she did not leave town because her Rockford friend was a recovering heroin addict and there would be too much temptation living there. The caseworker requested a home advocate to assist Ashley L. with her living situation. The report further indicated that she had refused drug testing on February 22, March 1, March 6, March 13, and March 15. On April 12, 2018, a status report was filed in which it was reported that Ashley L. was evicted from her home, that she had moved to another friend's home in DuQuoin, that she had obtained employment and would start her new job on April 16, and that she was currently pregnant.

¶ 30    On April 16, 2018, the State filed a motion to change the permanency goal, arguing that J.M.J.'s parents had failed to make substantial progress in recommended services and requested that the permanency goal be changed to substitute care pending a determination on the termination of parental rights. The State contended that J.M.J. had been in DCFS custody for approximately two years and eight months and deserved permanency. On May 3, 2018, Ashley L. tested positive for methamphetamine. A June 1, 2018, status report prepared by Lutheran reported that there were no changes in completion of services for Ashley L.; that after her positive drug test, she became irate; that it was reported that she might have lost the baby and was in the hospital, but Ashley L. later admitted that she was fine and only said that she lost the baby to get back at Cody J.; that she failed to appear for

12

her May 17, 2018, visit with J.M.J.; and that she was arrested on May 18, 2018, for theft over $500.

¶ 31    On June 19, 2018, a case report was filed, which indicated that J.M.J.'s foster parents were unable to provide J.M.J. with a permanent home and that, although she was generally happy and well behaved, she had been misbehaving recently, and her foster parents believed that her misbehavior was the result of the disruption to her routine visits with Ashley L. and Cody J.  Ashley L. had missed her June 7 and June 14 visits with J.M.J. because she was in jail, and J.M.J. had not been taken there for the visits.

¶ 32    On June 22, 2018, the trial court held a hearing on the motion to change the permanency goal.  At the hearing, Tatiana Marshbanks, a Lutheran caseworker who had worked on J.M.J.'s case since October 2017, testified that J.M.J. was currently in placement but that her foster parents were not willing to adopt her; the foster parents were willing to allow J.M.J. to stay with them until the permanency goal changed.  She opined that neither parent was in a position to have J.M.J. returned home to them.  She testified that the only service that Ashley L. completed in her service plan was parenting.  She further testified that Ashley L. and J.M.J. had a good bond, that Ashley L. was engaged with J.M.J., and that J.M.J. appeared to enjoy visits with Ashley L.

¶ 33    Brenda Wampler, a counselor who provided counseling and advocacy for individuals that were sexually assaulted and abused, testified that she provided sexual abuse counseling services for J.M.J. from March 2016 through June 2017.  She explained that there were allegations that J.M.J.'s maternal grandfather had sexually abused J.M.J.; that during the entire time she counseled J.M.J., J.M.J. was consistent in these allegations;

13

and that J.M.J. exhibited behaviors that supported the allegations. She recommended that J.M.J. not be placed in a home with the grandfather because then it would be seen as denying the abuse, and J.M.J. would be reluctant to speak up in the future.

¶ 34    Nancy Hulfachor, a Court Appointed Special Advocate (CASA) volunteer coordinator, testified that she had worked as an advocate on J.M.J.'s case since September 2017. As an advocate, she met with Ashley L. and J.M.J.'s foster mother, she visited the foster home and J.M.J.'s school, and she attended almost every visit between J.M.J. and Ashley L. Noting that J.M.J. had been in placement for approximately three years, she opined that it would be in J.M.J.'s best interests to move to a permanent home where she would be safe and loved. She explained that Ashley L. and Cody J. had been given every opportunity to make the necessary changes in their lives and that those changes had not been made. She also explained that J.M.J. loved her mother and father, but she yearned for permanency and a forever home.

¶ 35    After hearing the testimony, the trial court granted the State's motion to change the permanency goal to substitute care pending a determination on the termination of parental rights. In making this decision, the court considered J.M.J.'s age, her current placement, her current physical and emotional state, and the types of services previously offered. The court found that neither parent had exhibited the ability to provide a stable home, that neither parent had completed their service plan, and that the change of permanency goal was in J.M.J.'s best interests. That same day, the court entered a written permanency order, finding that Ashley L. had not made reasonable and substantial progress and efforts toward J.M.J.'s return home and changing the permanency goal.

14

¶ 36 A status report filed August 8, 2018, reported that J.M.J. had been moved into a new foster home where the parents were willing to adopt her; that Ashley L.'s last visit with J.M.J. was on June 22; that Ashley L. was transferred to a residential rehabilitation program, which offered support for her substance abuse issues; that she could remain there for the length of her pregnancy; and that once she gave birth, the new foster parents were willing and able to take the baby into their home if necessary.

¶ 37 On August 13, 2018, the State filed a motion for termination of parental rights and for appointment of a guardian with power to consent to adoption, asserting *inter alia*, that Ashley L. was unfit to have J.M.J. under section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2016)) in that she failed to make reasonable efforts to correct the conditions that were the basis for J.M.J.'s removal during any nine-month period after the adjudication of neglect and under section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)) in that she failed to make reasonable progress toward J.M.J.'s return during any nine-month period after the adjudication of neglect. The State argued that it was in J.M.J.'s best interests that Ashley L.'s parental rights be permanently terminated and that J.M.J. be placed in DCFS guardianship. On August 20, 2018, the State filed a supplement to its motion, which identified the relevant nine-month periods as November 24, 2015, through August 24, 2016; August 24, 2016, through May 24, 2017; and May 24, 2017, through February 24, 2018.

¶ 38 A September 5, 2018, Lutheran status report noted that Ashley L. had given birth to J.A.J. on August 20, 2018; that she continued to live in the treatment facility; that J.A.J. was living in the same home as J.M.J.; and that Ashley L. had visitation with both children

15

on August 27.  A September 26, 2018, Lutheran status report indicated that Ashley L. was receiving weekly visits with J.M.J. and had regular telephone contact with her.  On November 26, 2018, Lutheran filed another status report, which indicated that Ashley L. was still living in the rehabilitation facility and was receiving weekly visits with J.M.J.  However, it was reported that although the visits were going well, J.M.J. required validation that she was not going to be left alone with Ashley L.  It was also reported that Ashley L. was only a few months into drug court and still had a while to go before the agency would be confident that she would remain clean.  The report indicated that there were concerns about where she would live when released from the rehabilitation facility as she had no support system.  A December 28, 2018, Lutheran status report noted that Ashley L. had recently told J.M.J. that she was taking J.M.J. away from her foster family, and J.M.J. was visibly upset and said that she did not want to return to Ashley L.'s home.  On January 10, 2019, Lutheran recommended that the parental rights of both Ashley L. and Cody J. be terminated.

¶ 39    At the January 11, 2019, fitness hearing, Jessica Melton, a former child welfare specialist at Lutheran, testified that she worked on J.M.J.'s case from August 2015 through December 2016.  As the child welfare specialist, she was involved in preparing Ashley L.'s integrated assessment, which was used to determine the recommended services in the service plans.  The following services were recommended for Ashley L.: housing, substance abuse assessment and recommendations, parenting classes, mental health counseling, and employment.  The service plan was then evaluated every six months to determine whether Ashley L. was complying with recommended services.  During the

16

entire time that Melton worked on the case, Ashley L. did not complete any of her recommended services and had been homeless and incarcerated for a period of time. For the first three months after the completion of the integrated assessment, she had no contact with Ashley L. After Ashley L. was released from incarceration, she reengaged in services, but she never completed services while Melton was the caseworker.

¶ 40    Tiffany Wilder testified that she was the Lutheran caseworker on the case from December 2016 until October 2017. Although Ashley L. eventually completed her substance abuse assessment, she was rated unsatisfactory for that service because she did not follow through with the recommendation to complete individual and group counseling services; her counselor discontinued her from that service for missing too many appointments. Her mental health services were delayed because she was required to complete her substance abuse services first. She was initially unsuccessfully discharged from parenting classes because she missed too many appointments; the classes were through a counselor at Lutheran. She never went back to that program, but Wilder was able to conduct one-on-one parenting classes for her. She was living with a friend, and Wilder determined that the housing was appropriate. She had been consistent with visitation, but she started missing visits in April 2017. She maintained regular contact with Wilder. Although there was a time when Wilder believed that Ashley L. would accomplish her service goals, and she continued to have faith in Ashley L., she noted that Ashley L.'s biggest problem was "follow through." She noted that when she transferred the case, both Ashley L. and Cody J. were back on track and engaging in services.

17

¶ 41    Tatiana Marshbanks testified that she was the Lutheran caseworker on the case from October 2017 until July 2018. When she took over, she conducted a home visit, and everything appeared well; Ashley L. was employed, had completed parenting, was engaging in substance abuse services, had visitation, and had housing. However, later that night, she received information that Ashley L. had overdosed while at work. Although Ashley L. initially did not admit to overdosing on heroin, it was confirmed when Marshbanks obtained her medical records. She eventually acknowledged that she had overdosed and that she was no longer employed. She had her first mental health assessment in December 2017, but she never followed up with the recommendations from the assessment. In the beginning, her housing was rated satisfactory. However, in approximately December 2017, it became unstable because the friend was regularly kicking her out of the home. When Marshbanks left her employment at Lutheran, Ashley L. was incarcerated, and they were trying to get her admitted into a treatment facility. During Marshbanks's time on the case, Ashley L. did not complete any of her remaining recommended services.

¶ 42    Bailey Reed, a foster care and adoption caseworker at Lutheran, testified that she was assigned to the case on July 17, 2018, and at that time, Ashley L. was incarcerated. Shortly after, Ashley L. was transferred to a rehabilitation facility for expectant mothers. Although she had failed to successfully complete all of her services (obtain and maintain suitable housing, mental health treatment, and substance abuse treatment), she was receiving mental health and substance abuse treatment at the rehabilitation facility. She also had visitation and telephone contact with J.M.J. Reed further noted that Ashley L. had

18

been drug tested while in the facility, and she had tested negative. Reed explained that Ashley L. was doing well in the facility, but she was concerned about Ashley L. not having a plan after completing the program. She noted that Ashley L. could remain there for up to six months after completing the program, but J.M.J. could not live there with her.

¶ 43 After hearing the testimony, the trial court found that the State had met its burden of proof that Ashley L. was unfit in that she had not made reasonable efforts to correct the conditions that were the basis for J.M.J.'s removal during any nine-month period following the adjudication of neglect and had not made reasonable progress toward J.M.J.'s return home during any nine-month period following the adjudication of neglect.

¶ 44 At the February 22, 2019, best-interest hearing, Ashley L. testified that she was currently employed, but she was unable to pay for her own housing. She had been clean from drugs for one year; she entered drug court in August 2018 and was currently in phase two of drug court. She acknowledged that she was court ordered to not have contact with Cody J., and she had violated that order and had lied to the drug court judge and her caseworker about having contact with him.

¶ 45 Reed testified that J.M.J. was almost seven years old and J.A.J. was six months old. The progress reports from J.M.J.'s school indicated that she was doing really well, that she was getting all A's and B's, that her teachers loved her, that she was super helpful with the other students, and that she was a good student. Reed testified that J.M.J. enjoyed going to school in Carmi and that she had a large friend group there. J.M.J. had been in her current foster home with Kyle and Ashley G. since July 2018. Reed explained that the home was in a really nice neighborhood on a dead-end street, that it was really big, and

19

that it had a big backyard. J.M.J. and J.A.J. shared a bedroom; the foster parents had an adopted son, who was five years old; and all three children got along really well. Reed visited J.M.J. once per month in the home and observed that J.M.J. was very attached to her foster parents and that she was doing really well. She opined that J.M.J. was a very happy, outgoing little girl. She testified that J.M.J. liked to draw pictures, play in the backyard, and make videos of herself dancing. She observed J.M.J.'s interactions with her foster parents and noted that they were very good with her, that they gave her emotional support, that they were loving and understanding with her, and that they all got along very well. She further testified that J.M.J. identified her foster family as her family, and she called her foster mother and foster father, mom and dad, and her foster brother, little brother and best friend.

¶ 46 Reed testified that she also observed J.M.J.'s visits with Ashley L. and noted that their relationship appeared to be more of a girlfriend relationship than a mother/daughter one. However, she noted that, overall, the visits went relatively well. Reed expressed concern with Ashley L.'s ability to parent J.M.J. even though she was actively participating in her program at the rehabilitative facility. She explained that Ashley L. and Cody J. recently had telephone contact while Cody J. was incarcerated, and she was able to listen to the recordings of those conversations. Based on those recordings, she believed that both parents still had a lot of recovery that needed to occur before they were able to care for the children. Reed also expressed concern because Ashley L. had rekindled her relationship with her mother when it had previously been alleged that Ashley L.'s father had sexually abused her and J.M.J. and that her mother had been present in the home while it happened.

20

Reed worried that Ashley L. did not believe that she could move forward on her own and that she felt like she needed support from either her mother or Cody J. Reed opined that the least disruptive placement for J.M.J. would be with her foster family; J.M.J. had indicated that she wanted to remain with them.

¶ 47    Reed testified that Ashley L. also had a service plan with regard to J.A.J. and that she was currently meeting her goals with regard to that service plan. Although she did not have stable housing, and she had not been employed for long, Reed noted that Ashley L. did have part-time employment and was on track with her service goals. J.A.J. had been placed in the same foster home as J.M.J. because it was important to keep the siblings together. Reed acknowledged that if Ashley L. successfully completed her service plan with regard to J.A.J., then J.A.J. could be removed from the foster home, which could negatively impact J.M.J. However, Reed explained that they would have sibling visits if they both lived in different homes, that J.M.J. had been in care for a long time, and that she needed permanency.

¶ 48    At this point in the proceedings, Associate Judge Timothy Neubauer announced that he was stopping the hearing because he had "heard enough," he would not rule, and he would recall the case when he was ready. In stopping the proceeding, he noted that Ashley L. was doing services to return J.A.J. home, that the caseworker had said that it was important for the siblings to remain together, and that there was no permanency in J.M.J.'s foster home because they were "new people." The State vehemently objected to the court stopping the hearing at this point.

21

¶ 49    On March 27, 2019, the State filed a motion for substitution of Judge Neubauer.  In the motion, the State noted that, during the best-interest hearing, Judge Neubauer interrupted the State's case and indicated that he had already made a decision to deny the State's petition to terminate the parental rights because of the importance of the relationship between J.M.J. and J.A.J.  The State argued that in basing the decision on this one factor, Judge Neubauer ignored the remaining best-interest factors that were to be considered and exhibited an extrajudicial bias in favor of sibling contact at the expense of all other factors relevant for the best-interest determination.  The State also argued that Ashley L.'s services were relevant for the fitness portion of the hearing, which was previously held, but was not a specified factor in the best-interest determination.  The State further argued that in stopping the hearing, Judge Neubauer failed to hear the testimony of the State's remaining witnesses, which included the foster parents and thus, excluded evidence that would advance the State's position.  The State contended that Judge Neubauer's prejudgment of the issues evidenced an extrajudicial bias in favor of allowing Ashley L. to complete services on a child who was not the subject of this action.  On July 2, 2019, the State's motion to substitute judge was denied by docket entry as the motion was moot because Judge Neubauer had announced his retirement.

¶ 50    On May 29, 2019, Lutheran filed a status report, which indicated that Ashley L. was still residing at the rehabilitation facility, that she was working in the cafeteria full-time, that she regularly attended counseling, that she received visitation with J.M.J. every week for one hour, that the visits would be increased once school was over, that she had been making progress on her service goals, that she participated in regular drug tests, and that

22

she was currently working on finding permanent housing. On August 1, 2019, Lutheran filed another status report, indicating that Ashley L. had recently moved into her own apartment, that she was still employed and attending counseling, that she was still receiving visits with J.M.J., and that her random drug tests had all been negative. The report indicated that J.M.J. was showing signs of stress and confusion regarding visits with Ashley L. and stated that she did not know when she should be happy because she loved her foster parents and Ashley L. J.A.J. was still residing in the foster home with J.M.J., and Ashley L.'s court case involving J.A.J. was pending in Champaign County. J.M.J. had a very strong bond with her sister. The report further indicated that removing J.M.J. from her current foster home could cause behavioral and mental health issues but that removing J.A.J. from the home could also cause J.M.J. to experience those issues.

¶ 51    On September 17, 2019, DCFS filed a motion for change of the permanency goal, requesting that the permanency goal be changed from substitute care pending the court's determination on the termination of parental rights to return home in five months. In the motion, DCFS noted that it had recommended that J.A.J. be returned to Ashley L. with six months of aftercare services, and if that occurred, then J.M.J. and J.A.J. would be residing in different homes. DCFS argued that it would be against J.M.J.'s best interests to be placed apart from her sibling in a nonrelative foster home. DCFS noted that Ashley L. had successfully completed all of her service plan goals in this case as well as in the pending case involving J.A.J. Accordingly, DCFS requested that the permanency goal be changed so that permanency could be achieved and so that the family ties could be preserved. That same day, J.A.J. was returned to Ashley L.

23

¶ 52　On September 23, 2019, a best-interest report was filed by the CASA caseworker, which indicated that J.M.J. was questioned about her current placement. During the questioning, she expressed her fear that she would have to leave her foster home like her sister did, and she indicated that she loved her life with her foster family, would not change anything about it, and wanted to remain there forever. She indicated that she talked to her foster mother and her foster father when she was sad or needed someone to talk to. She talked about how she was going to change her name when she was adopted. When asked where she would like to live if she could not live with her foster family, she responded, "At Chunky [*sic*] Cheese." The report indicated that J.M.J. and the foster parents' adopted son behaved like brother and sister and were protective of each other. It noted that the foster parents did an excellent job of directing the children's energy into positive activities to prevent problems; that they parented the children with a consistent, team-based approach; and that the children knew what was expected of them regarding their daily routines. The report also indicated that J.M.J. was close to her foster mother's parents and brother and that she called them grandma, grandpa, and uncle. It noted that J.M.J. loved gymnastics, had no problems expressing her thoughts and needs, and did not offer any conversation about Ashley L. or Cody J. The report further indicated that J.M.J. had made it abundantly clear that she desired to be adopted, live with her foster family forever, and visit her sister at Ashley L.'s house. An attempt to interview Ashley L. was made, but she indicated that she did not want to answer any questions until she had spoken with her attorney.

¶ 53　That same day, Ashley L. filed a motion to restore fitness, arguing that since the fitness hearing in January 2019, she had made substantial progress with her services in that

she had successfully completed all of the services on her current service plan. Thus, she contended that she was fit and that the finding of unfitness was inappropriate and should be set aside.

¶ 54   On January 2, 2020, the best-interest hearing resumed. At the hearing, Reed testified that although she believed that parental rights should have been terminated at the time of the last best-interest hearing, she did not believe that parental rights should be terminated now. She opined that it was best for J.M.J. to be reunited with Ashley L. and J.A.J. full-time. Reed explained that she did not believe that it would be disruptive to J.M.J. to move her from her foster home because she had such a strong bond with Ashley L. and J.A.J. Reed further explained that Ashley L. had done a fantastic job of getting her life together, she was a great mom, and she had completed her services. Reed had observed interactions between Ashley L. and J.M.J. and noted that they had a very good relationship, that they enjoyed spending time together, and that their relationship was very loving. Reed explained that Ashley L. was really good at parenting but also being J.M.J.'s friend and making sure that J.M.J. knew that she was loved even though they did not live together. Reed observed that J.M.J. and J.A.J. had a very strong bond and that J.M.J. liked to help take care of J.A.J. When asked to articulate what had changed with J.M.J. that caused her to change her mind about the best-interest determination, she answered that J.M.J. and Ashley L. visited regularly and more often, and she believed that J.M.J. was receiving unsupervised, overnight visits with Ashley L. She did not know if J.M.J. was doing well in her foster home.

25

¶ 55    Jill Roark, a second-grade teacher at Jefferson Attendance Center in Carmi, testified that J.M.J. was a student in her class and had been in her class since the fall of 2019. Roark described J.M.J. as a great student, explaining that she worked really hard with her academics, always gave her best, did everything that was asked of her, and was eager to learn. Roark noted that J.M.J. received high B's, participated in class, asked questions when she needed further clarification, and had a lot of friends. Roark testified that J.M.J. had stated that she got nervous and sick to her stomach when she had to visit Ashley L. When asked why she got nervous, she explained that she was nervous leaving her foster family and that although she wanted to see Ashley L., she wanted to return to her foster family. Roark testified that she had observed interactions between J.M.J. and her foster family and stated that, if she had not known otherwise, she would have thought that they were J.M.J.'s biological family. Roark acknowledged that she had never met Ashley L.

¶ 56    Ashley G., J.M.J.'s foster mother, testified that she was currently employed at the University of Illinois as a community worker, and she worked Monday through Friday from 8 a.m. until 4:30 p.m. As part of her job duties, she taught health and nutrition education and implemented adult education programs. Her husband, Kyle G., was currently employed as a truck driver and had a flexible schedule. They had an adopted son, who was six years old, and he was placed with them when he was two years old. She testified that either she or her husband were able to be home with the children, except for 1½ to 2 hours, two days a week when they went to daycare. She explained that her mother was also available to watch the children when needed. J.M.J. was placed in their home in July 2018. When she first came to their home, she was really withdrawn; when she would

26

get upset, she would hide, and she lied and tried to manipulate them. J.M.J. initially had a really hard time opening up and explaining how she felt. She was not having visits with Ashley L. at this time, but when they initiated visits again, J.M.J. wanted Ashley G. close by. Eventually, J.M.J. became more open to talking through issues and expressing her feelings. Approximately one month after J.M.J. was placed with them, J.A.J. was also placed there. J.A.J. was there until approximately one day before her first birthday. Ashley G. testified that J.M.J. did not exhibit any behaviors when J.A.J. was removed from the home and that the only thing she said about it was that she was sorry that Ashley G. was sad.

¶ 57     Ashley G. testified that they lived in a subdivision on a dead-end street in a three-bedroom, two-bathroom house. They had a big yard with a swing set and a playhouse. J.M.J. had her own room that was full of toys. Ashley G.'s son was really excited to have J.M.J. move into the house, and they instantly bonded. J.M.J. referred to him as her brother, and she said that she loved him. Although they squabbled like brother and sister, they played together a lot. J.M.J. drew a lot of pictures of the family and wrote "I love my family" on them. J.M.J. did gymnastics once a week, which she loved; she attended children's church with her foster brother; she had playdates with her friends; they all attended school functions together; and they did activities as a family, such as going to the zoo, movies, the children's museum, and going out to eat. J.M.J. was also close with Ashley G.'s family, and they were really involved in J.M.J.'s life. Kyle G.'s parents were also involved and liked to visit the children. She testified that J.M.J. had struggled with reading and mathematics in the beginning of the school year, but they worked at home to

27

improve her grades and had her in tutoring. She stated that J.M.J. easily made friends because she was sweet and likeable, and J.M.J. had a lot of friends at school and in the community.

¶ 58 Ashley G. testified that before visitations with Ashley L., J.M.J. would get a stomachache and get upset. She was really upset when she had to leave Christmas day and go to Ashley L.'s house. She said that she did not want to go and that she wanted to be able to call Ashley G. while she was away, but she did not feel like she could ask to call. She was always quiet for a few days when she returned home. She was not excited about Ashley L.'s new boyfriend and did not want to call him "dad." She said that he had gotten irritated with her and that she did not like him.

¶ 59 Ashley G. testified that she wanted J.M.J. to feel like she was a member of the family, but she did not want to pressure her; they tried to give J.M.J. the same opportunities and affection that they gave their son. Ashley G. also tried to encourage J.M.J. to have a relationship with Ashley L. and encouraged her to have a good time during her visits and to not worry. She noted that if Ashley L.'s parental rights were terminated, she would continue to allow visitation between J.M.J. and J.A.J. and J.M.J. and Ashley L. as long as it was healthy for J.M.J.

¶ 60 Since the previous hearing date, Reed had not been to their house, and they only heard from her a few times with regard to visits. The case was then transferred to a new caseworker, Kimberly Hutchcraft, who had only visited the house one time for approximately five minutes; Ashley G. explained that Hutchcraft had texted her a few times about visitation, but Hutchcraft had not been by their house since that first time and had

28

not called to ask how J.M.J. was doing. J.M.J. met Hutchcraft at Ashley L.'s house, and J.M.J. told Ashley G. that she did not feel like she could express her feelings to Hutchcraft and that she felt like she had to do what Hutchcraft wanted her to do.

¶ 61 Kyle G. testified that he worked three days a week as a truck driver. On his days off, he picked the children up after school; when working, the daycare picked them up from school, and Ashley G. picked them up at the daycare after work. Either he or Ashley G. took them to school in the morning. J.M.J. did gymnastics at the daycare. J.M.J. also liked to draw, and she drew pictures of them together and called that her family. They all liked to do things as a family, such as going to the zoo and the movies. His parents did not live nearby, but his in-laws lived approximately 30 minutes away and were very involved in the children's lives. He noted that J.M.J. and their son were bonded and called each other brother and sister; they had a typical sibling relationship.

¶ 62 Kyle G. testified that although J.M.J. was not as attached to J.A.J. as their son was, she tried to be very helpful with J.A.J. and liked to play with J.A.J. J.M.J. was upset when J.A.J. was removed from the home because she thought that J.A.J. would be able to stay with them. Although they had attempted to explain permanency to J.M.J., he did not think that she knew what it looked like because she had been in care for so long. She had made statements indicating that she wanted to stay with them and talked about living with them long term. He opined that J.M.J. considered herself a part of their family, and she was treated as such. Before visits with Ashley L., he noted that J.M.J. got nervous and upset and had said that she did not want to go because it made her nervous. When she returned home, it took her about one day to get back to her normal self. He noted that she did not

29

really talk too much about the visits except that she felt like she could not express her feelings. As long as it was healthy for J.M.J., she would be allowed to continue visitation with both J.A.J. and Ashley L. if Ashley L.'s parental rights were terminated.

¶ 63 Brenda Torrez, the executive director at CASA, testified that she worked on J.M.J.'s case by observing some of the visitations between J.M.J. and Ashley L., helping Ashley L. get admitted into the rehabilitation facility, and conducting home visits at the foster family's home. She noted that the visits between Ashley L. and J.M.J. were always good, that Ashley L. always brought along activities for them to do together, and they played together. She opined that it seemed like a friendship relationship. When she visited the foster family's home, she noted that J.M.J. was excited to show off her bedroom and described it as very nice and age appropriate. She described the relationship between the foster family and J.M.J. as a "family setting." She had not worked on the case since the previous hearing; at that time, she believed that Ashley L.'s parental rights should be terminated and that the foster family should be allowed to proceed with adoption because she had stability there, she was happy there, and she called that her home. Her main concern with returning J.M.J. to Ashley L. was that Ashley L. might not be doing counseling to help heal from past trauma. She acknowledged that she had not observed J.M.J.'s interactions with Ashley L. since May or June 2019.

¶ 64 Jane Page, a CASA advocate, testified that this case was transferred to her on August 22, 2019. She tried to do a home visit about once a month and, in between visits, she spoke with J.M.J. over the telephone. During the home visits, she observed that J.M.J. was very relaxed in the home and that she was always excited to see Page and to show off her

bedroom. Sometimes they played with dolls and other times J.M.J. just wanted to talk. She observed J.M.J.'s interactions with her foster family and noted that J.M.J. gave them affection, was treated just like a biological child, called them mom and dad, and did not hesitate to ask for things that she needed. She noted that J.M.J. felt very safe in the home, that she was very affectionate with her foster parents, and that her foster mother was her "go-to person." She explained that the foster family was very attached to J.M.J., and she did not observe anything of concern regarding J.M.J.'s interactions with them. She noted that J.M.J. did not really act like she had a sister unless it was brought up; Page believed that it was because of the close relationship between her and her foster brother and the closeness in their ages. Page also observed the interactions between J.M.J. and her foster brother and noted that they acted like brother and sister, were best friends, and she was protective over him. Page observed J.M.J.'s interactions with her foster mother's father and noted that she called him grandpa and that he referred to her as "our girl." Page had never met Ashley L.; Page attempted to speak with Ashley L., but she refused until she had spoken with her attorney and her caseworker because she was not sure what she could say or whether she even had to meet with Page. Page never heard back from her.

¶ 65 When Page interviewed J.M.J. while no one else was around, J.M.J. expressed her desire to stay with her foster family forever because it was like a "wonderland." Page testified that J.M.J. expressed nervousness about going to visits with Ashley L. and had complained of stomachaches and woken up terrified and anxious in the days before her visits. After visits, she had asked to call Page and, on one occasion, told Page that she had a bad visit because Ashley L. was going to marry her boyfriend. She also reported that, at

31

one visit, she saw her maternal grandfather, but she did not want to talk about that. Page opined that termination of parental rights would provide stability to J.M.J. and that it was in her best interests to remain with her foster family and allow them to pursue adoption.

¶ 66 Latoya Strong, the program supervisor at Lutheran, testified that Hutchcraft had moved to a new department in the agency, and the case was transferred to a new caseworker, Heather Milligan. Milligan was unable to testify at the hearing so Strong was testifying on her behalf. Although Strong was not a caseworker on the case, she had been to Ashley L.'s new home and observed her interactions with J.A.J. She noted that the home had two bedrooms, had room for both J.A.J. and J.M.J., and was clean. She testified that Ashley L. had full-time employment at a hospital cafeteria, and she had unsupervised, overnight visitation with J.M.J. every other weekend. Although she had never observed Ashley L.'s interactions with J.M.J., she opined that it was in J.M.J.'s best interests to be returned home to Ashley L. and for Ashley L. to retain her parental rights. She explained that the case involving J.A.J. was closed and that DCFS was no longer involved.

¶ 67 Ashley L. testified that she had resided in Champaign since August 2018 and that she was currently employed full-time in the cafeteria at OSF Hospital. She moved to Champaign when she was admitted into the rehabilitation treatment facility there. She described the treatment program as an intense one-year faith-based program. She explained that, while at the facility, she was able to work on the services in her service plan. She was two years clean from everything except for tobacco. She had housing with room for J.M.J., she had purchased a vehicle, and she had childcare arrangements in place should J.M.J. be returned home to her. She described J.M.J.'s relationship with J.A.J. as

32

loving and doting. She had a support system in Champaign that she met through the rehabilitation facility, and she planned to live in Champaign indefinitely. She planned to put J.M.J. in counseling if she was returned to her to assist with the transition.

¶ 68 Ashley L. testified that J.M.J. had spoken to her about her current foster family and that she loved them and her foster brother. As for J.M.J. stating that she wanted to live with them forever, Ashley L. explained that J.M.J. felt like she needed to make everyone happy, that she was protecting her foster family's feelings by saying that, and that she was scared to tell them the truth that she wanted to live with Ashley L. J.M.J. had never expressed to Ashley L. that she did not want to come to her home for visits. When Ashley L. asked her about getting stomachaches, J.M.J. stated that she felt like she could not tell her foster parents that she was excited to visit Ashley L., and she did not want to hurt their feelings. Ashley L. also testified that the foster parents told J.M.J. that she was getting adopted and that, since that time, J.M.J. felt the need to be a "good, little girl."

¶ 69 With regard to her past, Ashley L. explained that she had codependency issues with Cody J., and she lacked self-confidence. She had not spoken with Cody J. since she violated the no-contact order; their only connection was having a child together. She noted that, before the age of 27, she was a "normal person," who was in nursing school and had full-time employment as a technician at a dialysis unit. She became addicted to pain medication when she was prescribed Percocet after her C-section with J.M.J., and she battled that addiction for 2½ years. In September 2017, she relapsed after learning that J.M.J. may not be returned home to her even though she was successfully completing the service plan tasks. She has been sober for two years, and she was currently on drug court

33

probation. She did not think that she was currently addicted to drugs or alcohol; she explained that she was a "new creation in Christ."

¶ 70 Ashley L. testified that her romantic relationship with Cody J. ended approximately two years ago, and she was currently in a relationship with Jeremy Copely, who she met through the drug court program. He was currently on drug court probation. She explained that she would prioritize her children over Copely if necessary and that she did not have a problem telling him that he could not be around her or her children if he relapsed. Although she admitted to lying about having contact with Cody J. in the past, she explained that she had not yet had the appropriate amount of counseling to deal with her codependency issues. After approximately 12 months of intense therapy, she believed that those issues were fixed. She testified that she would break off the relationship with Copely if that prevented her from getting J.M.J. back.

¶ 71 Paige Strawn, the guardian *ad litem* (GAL), testified that she had been the GAL in the case since the beginning. Although she had never met with Ashley L. outside of court, she had spoken with her several times at court, and she observed that Ashley L. was not the same person as she was in 2015. She never met with J.M.J. individually, explaining that J.M.J. had been "hammered with people meeting with her," and she did not think J.M.J. needed another person questioning her. She further explained that she believed that J.M.J. was telling everyone what they wanted to hear, that she would not gain any more information from talking to her directly than she was already getting from everyone else, and that she believed that it was unnecessary and potentially harmful. She made attempts to speak with J.M.J. early in the case while at court, but J.M.J. was too young to

communicate. She opined that it was not in J.M.J.'s best interests that Ashley L.'s parental rights be terminated, noting that this was a different opinion than she would have given 18 months ago. She explained that J.M.J.'s relationship with J.A.J. was the most important relationship that she would ever have, and they had not been given a full opportunity to bond with each other. She described J.M.J.'s relationship with her foster brother as a "beautiful thing," and she hoped that continued for the rest of their lives, but she explained that she did not think that relationship trumped being with her biological sister. She further explained that she believed Ashley L. could care for both J.M.J. and J.A.J. in a safe environment, noting that Ashley L. was currently doing that, and Ashley L. knew the risks of messing up. Her opinion was based on conversations with the CASA employees, the caseworkers, and Ashley L. and the reports that were filed in the case. Strawn acknowledged that she had never observed J.M.J. in her foster home or in her visits with Ashley L.

¶ 72    After hearing the testimony, the trial court found that termination of Ashley L.'s parental rights was in J.M.J.'s best interests. In making this decision, the court noted that it heard and considered the following evidence: transcripts from the fitness hearing and the first part of the best-interests hearing; testimony from Reed, who had not seen J.M.J. since early 2019 but had changed her opinion that termination of Ashley L.'s rights was not in J.M.J.'s best interests without being able to articulate the reasoning behind this change; testimony from Roark, who talked about how well J.M.J. did in school and had observed J.M.J. every day and was familiar with the foster family and their place within the community; testimony that J.M.J. had problems at her previous placement in that she was

35

disruptive, and the family did not believe they could provide a permanent home for her; testimony that J.M.J.'s behavior had been excellent in her current placement and that she was doing well there; evidence that based on all of the reports, J.M.J. did not need counseling if she remained in her current placement, but she would likely need counseling if returned to Ashley L.'s home to help her cope with the new environment; testimony from the foster parents about the activities that took place in the home; testimony from Page about J.M.J.'s wishes; and testimony from Strong, who had never met J.M.J. and did not know that Ashley L. had been deceptive regarding her use of controlled substances and her relationship with Cody J.

¶ 73 The trial court then addressed Ashley L. and Cody J. as follows:

> "I am extremely happy drug court has had an effect on your life. I am happy that you are doing well. I am happy that you have your baby in your home and you are caring for your home, but I have got to go on what I hear the evidence to be today. We're not at clear and convincing standard for fitness. That's been decided. Judge Neubauer made that determination. He made a determination that you were unfit parents of [J.M.J.]. Today the burden is not so high, by preponderance of the evidence.
> *** We all know that parental bonds with children are strong, sibling bonds are strong, but I believe the evidence in this case outweighs that. And I believe that's by clear and convincing evidence that it's been proved today but certainly by preponderance of the evidence.
> I know where [J.M.J.] is going to be tonight. I know she's going to have a loving, safe home. I know her parents aren't drug addicts in recovery. I know that. Her foster parents—and financial [*sic*] alone *** should not be the sole reason, but I know that both of her parents have stable jobs. They have a stable part in the community. They are able to give [J.M.J.] love. They are able to consider her needs first. They know who is in their home. They know the relationship with each other. [J.M.J.] has expressed concerns about relationships with people she doesn't know, a boyfriend.
> So I believe the State has met their burden in this case. Sense of security, sense of familiarity of the child, continuation of the affection for the child, the child's wishes. Based on the evidence presented here in this court, all favor that your rights be terminated, both of your rights.

36

***  Substance abuse is *** long-term.  *** Being father and parent of a child is a fundamental right.  It's a fundamental right.  But a child to have security, a child to have stability, a child to have permanency in their life, that's a fundamental right of that child in this Court's opinion."

¶ 74    That same day, the trial court entered a written order terminating Ashley L.'s parental rights.  In the order, the court found that it was in J.M.J.'s best interests that Ashley L.'s parental rights be terminated and appointed DCFS as J.M.J.'s guardian with the power to consent to her adoption.  On January 3, 2020, Ashley L. filed her notice of appeal.  On January 27, 2020, the court entered a permanency order, changing the permanency goal to adoption.

¶ 75                                    II. ANALYSIS

¶ 76    On appeal, Ashley L. first contends that the termination of her parental rights was against the manifest weight of the evidence.  Termination of parental rights proceedings are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2018)).  *In re D.F.*, 201 Ill. 2d 476, 494 (2002).  A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act, which delineates a two-step process in seeking to terminate parental rights involuntarily.  705 ILCS 405/2-29(2) (West 2018).  The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds of unfitness enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)).  705 ILCS 405/2-29(2), (4) (West 2018); *In re D.T.*, 212 Ill. 2d 347, 352-53 (2004).  If the court finds that the parent is unfit, the matter proceeds to a second hearing, at which the State must prove, by a preponderance of the evidence, that termination of parental rights

37

is in the best interests of the child. 705 ILCS 405/2-29(2) (West 2018); *D.T.*, 212 Ill. 2d at 364-66. Once the parent has been found unfit, the parent's rights must yield to the best interests of the child. *In re Brandon A.*, 395 Ill. App. 3d 224, 239 (2009). The trial court's best-interests finding will not be disturbed unless it is against the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d 985, 1001 (2004). A determination is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence. *In re D.F.*, 201 Ill. 2d at 498.

¶ 77    In determining the best interests of the child, the trial court must consider the following statutory factors in the context of the child's age and developmental needs: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments, including where the child feels love, attachment, and a sense of being valued, the child's sense of security, the child's sense of familiarity, the continuity of affection for the child, and the least disruptive placement alternative for the child; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, which includes a need for stability and continuity of relationships with parent figures, siblings, and other relatives; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2018). The court is not required to make specific findings of fact concerning the best-interests factors under section 602 of the Juvenile Court Act where there is some indication in the record that it considered the enumerated factors when making the best-

interests determination. *In re Marriage of Stribling*, 219 Ill. App. 3d 105, 107 (1991); *In re Jaron Z.*, 348 Ill. App. 3d 239, 262-63 (2004).

¶ 78 Here, after carefully reviewing the record, in light of the best-interest factors that must be considered, we do not find that the trial court's determination to terminate Ashley L.'s parental rights was against the manifest weight of the evidence. Ashley L. contends that the court's best-interest determination was against the manifest weight of the evidence because she had obtained stable housing, she had obtained and maintained full-time employment, she had purchased a vehicle, J.M.J. and J.A.J. had a strong bond, and the DCFS caseworkers and the GAL agreed that her parental rights should not be terminated. However, we note that the trial court evaluated the testimony related to the above considerations and found that they did not outweigh the evidence in favor of termination by a preponderance of the evidence.

¶ 79 At the best-interest hearing, the trial court commended Ashley L. for getting her life together, expressed happiness that drug court was having a positive impact, and recognized that parental bonds with children and bonds between siblings were strong. However, the court found that it was in J.M.J.'s best interests to have stability, permanency, a sense of security, and a sense of familiarity in her life.

¶ 80 As previously noted, the focus of the best-interest determination shifts to the child. The record indicates that J.M.J.'s foster parents provide her with stability and permanency by giving her a safe and loving home with parents who have stable employment, a stable position in the community, and who are able to consider her needs first. The testimony indicated that J.M.J. had a strong bond with her foster family, who wish to adopt her; a

39

sibling relationship with her foster brother; and a close relationship with her foster family's extended family. Everyone who had observed J.M.J.'s relationship with her foster family, including Ashley L., acknowledged that J.M.J. loved her foster parents and foster brother. Page, the CASA advocate, testified that J.M.J. had expressed her wishes to remain with her foster parents, whom she considered family; that she was happy living with them; and that they provided her with comfort, security, and love. J.M.J.'s teacher, Roark, also testified that J.M.J. wished to remain with her foster family. Although Ashley L. testified that J.M.J. wanted to live with her and was afraid to tell the truth about her wishes, we note that the trial court, having observed the witnesses and hearing their testimony, is in a better position to weigh this evidence. *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 66.

¶ 81    In concluding that the trial court's decision was not against the manifest weight of the evidence, we recognize that sibling bonds are strong and that it is important for J.M.J. to maintain her bond with J.A.J. Also, we have considered the testimony from the DCFS caseworkers and the GAL relating to their best-interest opinions. However, we conclude that the trial court's finding that these considerations do not outweigh J.M.J.'s need for stability, security, and permanency, which has been consistently provided in the foster home, was supported by the evidence.

¶ 82    Moreover, we note that, even living in a different home, J.M.J. will continue to maintain her bond with J.A.J. and Ashley L., as both foster parents testified that she would be allowed continued contact with Ashley L. and J.A.J. as long as maintaining those relationships was healthy for her. Thus, after considering the best-interest factors, we find

40

that the court's decision to terminate Ashley L.'s parental rights as being in J.M.J.'s best interests was not against the manifest weight of the evidence.

¶ 83    Second, Ashley L. argues that her due process rights were violated by the GAL's failure to perform the GAL's statutory duties to have a minimum of one in-person contact with the minor child and one contact with the foster parents.[1]   Ashley L. contends that because of the GAL's failure to meet with J.M.J. and the foster parents, the GAL's recommendation that Ashley L.'s parental rights should not be terminated was not as persuasive to the trial court.  The State claims that Ashley L. has forfeited her right to raise this issue on appeal as she did not raise it before the trial court.  Issues not raised in the trial court, which include constitutional questions, are forfeited and may not be raised for the first time on appeal.  *Fawcett v. Reinertsen*, 131 Ill. 2d 380, 386 (1989); *Flood v. Wilk*, 2019 IL App (1st) 172792, ¶ 29.  Because Ashley L. did not raise her due process claim in the trial court, she has forfeited that claim on appeal.  However, this court can review the claim if she has shown plain error.  *In re M.W.*, 232 Ill. 2d 408, 431 (2009).  In her brief, Ashley L. does not acknowledge the forfeiture of this issue and does not ask us to review her claim under the plain-error doctrine.  Accordingly, she cannot meet her burden of

---

[1]Section 2-17(8) of the Juvenile Court Act provides as follows with regard to the GAL's duties: "The guardian *ad litem* or an agent of the guardian *ad litem* shall have a minimum of one in-person contact with the minor and one contact with one of the current foster parents or caregivers prior to the adjudicatory hearing, and at least one additional in-person contact with the child and one contact with one of the current foster parents or caregivers after the adjudicatory hearing but prior to the first permanency hearing and one additional in-person contact with the child and one contact with one of the current foster parents or caregivers each subsequent year.  For good cause shown, the judge may excuse face-to-face interviews required in this subsection."  705 ILCS 405/2-17(8) (West 2016).

persuasion to demonstrate plain error, and any plain-error argument has also been forfeited. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010).

¶ 84    Third, Ashley L. argues that she was denied effective assistance of counsel in that her counsel at the initial best-interest hearing failed to object to the trial court's decision to recess the hearing. Ashley L. also contended that subsequent counsel was ineffective because counsel failed to object to the GAL giving an opinion on termination without contacting J.M.J. and the foster parents as required by statute.

¶ 85    Although there is no constitutional right to counsel in proceedings under the Juvenile Court Act, the Act grants a statutory right to counsel. 705 ILCS 405/1-5(1) (West 2018); *In re S.G.*, 347 Ill. App. 3d 476, 479 (2004). Implicit within the right to counsel is that such representation must be effective. *In re S.G.*, 347 Ill. App. 3d at 479. Illinois courts apply the standard utilized in criminal cases to evaluate the effectiveness of counsel in juvenile proceedings. *Id.* Accordingly, our review of ineffective assistance of counsel claims in juvenile proceedings is guided by the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984). *In re S.G.*, 347 Ill. App. 3d at 479. To succeed on a claim of ineffective assistance of counsel under the two-prong *Strickland* standard, a respondent must show that (1) counsel's representation fell below an objective standard of reasonableness (deficient performance prong), and (2) a reasonable probability exists that, but for counsel's error, the result of the proceeding would have been different (prejudice prong). *Id.* Both prongs of the *Strickland* test must be satisfied to succeed on a claim of ineffective assistance of counsel. *People v Patterson*, 192 Ill. 2d 93, 107 (2000).

Therefore, the failure to establish either prong under the *Strickland* test is fatal to the claim. *Id.*

¶ 86    To establish deficiency under the first prong, a respondent must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy. *People v. Jones*, 2012 IL App (2d) 110346, ¶ 82. "Matters of trial strategy are generally immune from ineffective assistance of counsel claims and will not support such claims unless counsel's strategy was so unsound that counsel completely failed to conduct any meaningful adversarial testing of the State's case." *People v. Crutchfield*, 2015 IL App (5th) 120371, ¶ 34. Reviewing courts are highly deferential to trial counsel on matters of trial strategy, evaluating counsel's performance from her perspective at the time of trial, rather than through hindsight. *People v. Perry*, 224 Ill. 2d 312, 344 (2007). Decisions as to what matters to object to and when to object are considered matters of trial strategy. *Id.*

¶ 87    Here, we conclude that trial counsel's decision to not object to the continuation of the best-interest hearing was a matter of sound trial strategy and did not amount to ineffective assistance of counsel. After hearing testimony that J.A.J. and J.M.J. were placed in the same foster home because of the importance of maintaining their sibling bond and that J.A.J. had been returned to Ashley L., the court recessed the initial best-interest hearing in the middle of the testimony. In doing so, the court made clear that it was not going to terminate Ashley L.'s parental rights at that time. Thus, the continuation of the hearing gave Ashley L. additional time in which to demonstrate that she could provide a safe and stable home for J.M.J., that she could maintain employment, and that she could

remain drug free. Moreover, although Ashley L.'s counsel made no objection to the continuation of this hearing, the State vehemently objected, and the court continued it over the State's objection. Ashley L. has failed to demonstrate that the result of the hearing would have been different had her counsel joined the State in objecting to the continuation of this initial hearing.

¶ 88   Last, Ashley L. contends that her subsequent counsel was ineffective for failing to object to the GAL's testimony on the basis that the GAL had not spoken to J.M.J. or the foster parents before forming an opinion on the best-interest determination. We find this argument unpersuasive as she has failed to demonstrate prejudice. The GAL's testimony was completely favorable to Ashely L.; the GAL testified that Ashley L.'s parental rights should not be terminated. The GAL explained that she did not talk with J.M.J. because, initially, J.M.J. was too young, and when J.M.J. was older, she believed that having another person questioning J.M.J. would not be helpful and could even be harmful. The GAL further explained that she based her best-interest opinion on her conversations with all of the caseworkers; reading all of the status reports; and her conversations with Ashley L., Ashley L.'s mother, and every attorney who has been involved in the case. There is no indication in the record that the court considered the GAL's testimony less persuasive because she did not personally speak with J.M.J. and the foster parents; when making its decision, the court even stated that the GAL had done a good job in the case. Accordingly, we find that Ashley L.'s counsel at the subsequent best-interest hearing was also not ineffective.

44

¶ 89                                III. CONCLUSION

¶ 90    For the foregoing reasons, we affirm the judgment of the circuit court of Jefferson County.

¶ 91    Affirmed.